**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

**TYRONE HARRIS** **PLAINTIFF**

**vs.** **Case No. 4:25-CV-4046-SOH**

**WAYNE EASLEY, Individually and in his Official Capacity;**
**BRANDON YELEY, Individually;**
**MASON ROBERTS, Individually;**
**GOLDEN ADAMS, Individually;**
**RICHARD HENDERSON, Individually;**
**SOUTHERN HEALTH PARTNERS, INC.,**
**STEVEN KING; and**
**KEVIN MCCANN** **DEFENDANTS**

# BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The Plaintiff filed his Complaint in this case on June 6, 2025, alleging, in pertinent part and under 42 U.S.C. 1983, the Americans with Disabilities Act (ADA), and the Arkansas Civil Rights Act, that Separate Miller County Defendants violated his constitutional and statutory rights by allegedly subjecting him to excessive force on two occasions and by allegedly not complying with the ADA. The Plaintiff also appears to make a derivative training claim and/or a policy or custom claim. Doc. # 3.

For the reasons set forth herein, the Separate Miller County Defendants are entitled to qualified immunity and summary judgment as a matter of law.

## II. ARGUMENT

The Plaintiff alleges, *inter alia*[1], that the Separate Miller County Defendants (1) violated his constitutional rights by allegedly subjecting him to excessive force on two occasions and (2) generally violated the ADA. As discussed herein, the County Defendants are entitled to qualified immunity and summary judgment as a matter of law.

[1] The Plaintiff has also sued several Defendants associated with Southern Health Partners, Inc., for medical malpractice, however, the undersigned counsel understands that those claims will soon be dismissed.

## Summary Judgment Standard

"Summary judgment is appropriate when there is no dispute between the parties as to any genuine issues of material fact and when the moving party is entitled to a judgment as a matter of law." *Get Away Club, Inc. v. Coleman*, 969 F.2d 664 (8th Cir. 1992). All facts and inferences are looked at in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## *Celotex* "Scintilla Rule"

In *Celotex v. Catrett,* 477 U.S. 317 (1986), the seminal case on interpreting the federal summary judgment rule, F.R.C.P. 56(c), the Supreme Court carefully explained that a party seeking summary judgment always has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, *if any*,' which it believes demonstrate the absence of a genuine issue of material fact." The *Celotex* Court held ultimately that the movant need not submit supporting affidavits in order to prevail if he can show from the other material on file the absence of a genuine issue of material fact. The case may properly be cited for the proposition that a party moving for summary judgment may shift the burden of proof by showing that the plaintiff will be unable to offer any proof on an essential element of his case (generally referred to as the "scintilla rule").

The Court, in reaching its conclusion, explained that its holding in *Adickes v. Kress,* 398 U.S. 144, a 1970 case which construed Rule 56(c), did not mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the non-moving party bears the burden of proof, but instead, the moving party may discharge its burden by pointing out to the district court that "there is an absence of evidence to support the non-moving party's case." The movant may carry its burden "with or without supporting affidavits." *See Celotex supra.* It is the non-movant who must go beyond the

pleadings and by affidavit, depositions or other *substantive* evidence designate specific facts showing that there is a genuine issue for trial. *Id.* (Emphasis added).

**Qualified Immunity Standard**

Public officials and employees are entitled to qualified immunity unless their alleged conduct violates "clearly established statutory or constitutional rights or which a reasonable person in their positions would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to allow public officials to perform their duties in a manner they believe to be correct without fear for their own financial well being. *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002). "Toward this end, the rule has evolved that an official performing discretionary functions will generally be immune from liability unless a reasonable person in his position would have known his actions violated clearly established law." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

A court engaged in a qualified immunity inquiry uses a two step process. *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1103 (8th Cir. 2004). The first question is, taken in the light most favorable to the party asserting the injury, whether the facts alleged show that the official's conduct violated a constitutional right. *Craighead v. Lee*, 399 f.3d 954, 961 (8th Cir. 2005)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the facts, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right, the second question is whether the right was clearly established. *Id*. Those questions can now be considered by the Court in any order. *See Pearson v. Callahan*, 555U.S. 223 (2009). For the reasons set forth below, the Defendants are entitled to qualified immunity and summary judgment as a matter of law.

As to the clearly established prong of the defense, to clearly establish a legal principle "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019). The rule in question's contours must be "***well defined at a 'high degree of specificity***.'" *Id*. (emphasis added); *see also Rusness v. Becker County, Minn.*, 31 F.4th 606 (8th Cir. 2022) ("[t]his means that the right in question must be construed fairly narrowly ***and that the facts in the present***

***case must align with facts in precedent*.") (emphasis added).

**A. No Individual Capacity Liability - Qualified Immunity**

The Plaintiff's claim(s) in this suit against the individual County Defendants is that his constitutional rights were violated when he was allegedly subjected to excessive force in separate incidents during his incarceration at the Miller County Jail, on December 31, 2020 and July 2, 2021. respectively.

The Defendants in this case are entitled to qualified immunity, in their individual capacity, on the Plaintiff's claim(s) unless (1) they violated a federal constitutional right belonging to Plaintiff Harris (2) that was clearly established at the time of the violation, such that reasonable officials in the Defendants' positions would have known that they were violating that right. *See Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The two prongs of this test may be analyzed in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

**Fourteenth Amendment Excessive Force Standard in "Video Case"**

In *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015), the Supreme Court revisited its analysis of excessive force as to claims against jail employees by a pretrial detainee. First, the Court held that the subjective motivations or thoughts of an officer accused of excessive force under the Fourteenth Amendment are not relevant. *Id*. at 395-96. Rather, the Court held that courts must employee an objective standard as to the law enforcement officer's conduct. *Id*. at 397. So, the Court concluded a plaintiff must show that the force used against him was used "purposely or knowingly" used and that the force was "objectively unreasonable," which "turns on the 'facts and circumstances of each particular case." *Id*. at 396-397.

The *Kinglsey* Court said: "The objective reasonableness determination must be made from the perspective of a reasonable officer on the scene, including what the officer knew at the time, ***"not with the 20/20 vision of hindsight*.**" *Id*. (emphasis added). A court must also account for the "'legitimate interests that stem from [the government's need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of

jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). The Court added: "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat *reasonably perceived by the officer*; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. The Court also held that "'the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Punishment includes actions taken with the "'express intent to punish.'" *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 538). Alternatively, a pretrial detainee might prevail if he or she can show the actions/force at issue was not "'reasonably related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 561).

"'[R]unning a prison is an inordinately difficult undertaking.'" *Kingsley*, 576 U.S. at 399 (quoting *Turner v. Safely*, 482 U.S. 78, 84-85 (1987)). Safety and order depend upon correctional officials' expertise and affords "'substantial discretion to devise reasonable solutions to the problems they face.'" *Kingsley*, 576 U.S. at 399 (quoting *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1515 (2012)).

Jail officials are "'often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving.'" *Kingsley*, 576 U.S. at 399 (quoting *Graham*, 490 U.S. at 397). Thus, in judging the reasonableness of an officer's actions, courts must do so from the "perspective and with the knowledge of the defendant officer." *Kingsley*, 576 U.S. at 399. The Court reserved the question of whether the Eighth Amendment "malicious and sadistic" standard for excessive force might apply to a pretrial detainee under the Fourteenth Amendment. *Id* at 400.

In *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009), the Seventh Circuit said:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required

> to obey orders. When an inmate refuses to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*See also Williamson v. Walters*, Civil No.: 6:18-CV-06041, 2020 WL 3442328, at 5 (W.D. Ark. May 14, 2020) (citing and applying the above quote from *Lewis v. Downey*) (Report and Recommendation adopted at 2020 WL 3442176 (W.D. Ark. June 23, 2020) (unreported). This rule, based on the realities of prison administration, should not be confined to an Eighth Amendment claim, particularly given *Kingsley*'s repeated findings that running a jail is inordinately difficult, deference should be afforded to correctional officials, and the analysis calls for an objective review of the facts.

In *Ryan v. Armstrong*, the Eighth Circuit Court of Appeals considered an excessive force claim by a pretrial detainee who had already exhibited bizarre behavior in the jail. Officer Gacke directed the plaintiff there to back away from his door and lie on his bunk, but the plaintiff refused to obey that command. 850 F.3d 419, 424 (8th Cir. 2017). The plaintiff continued to actively resist once officers entered the plaintiff's cell. *Id*. Like this case, the plaintiff bit one of the officers. Officers continued to struggle with the plaintiff and eventually deployed a taser twice in drive stun mode. *Id*. The plaintiff was later found unresponsive. *Id*. Citing *Kingsley*, the Eighth Circuit said: "[w]e analyze the excessive force claims of pretrial detainees under an objective reasonableness standard." 850 F.3d at 427. The Court adopted all of the standards set forth above by the Supreme Court in *Kingsley*. *Id*.

The Court found that the plaintiff's refusal to lie down on his bunk and resisting officers' attempts to subdue plaintiff amounted to active resistance by the plaintiff. *Id*. The Court noted the significance that the plaintiff bit one of the officers' in their attempts to subdue the plaintiff in the calculus as to whether the force employed was objectively reasonable. *Id*. at 428. The Court ruled: "[u]nder the totality of the circumstances, we conclude that none of the defendants' actions, either singly or in combination, amounted to an objectively unreasonable application of force." *Id*. In drawing this conclusion, the Court cited *Blazek v. City of Iowa City*, 761 F.3d 920, 923 (8th Cir. 2014), and noted that in *Blazek* the Court rejected an excessive force claim where an officer 'forceable threw' the plaintiff to the ground, pinned him down, and placed his weight into the

plaintiff's back before handcuffing him' even though the plaintiff had only been passively resisting. 850 F.3d at 428 (quoting *Blazek*, 761 F. 3d at 923).

Finally, and relevant to this case, *at least* where a video supplies undisputed proof that blatantly contradicts Plaintiff's allegations—and such is the case here—it is the video or other evidence which blatantly contradicts Plaintiff's allegations rather than such unsupported allegations that governs and supplies the undisputed facts. *See Klum Estate of Klum v. City of Davenport*, No. 3:23-cv-00043-RGE-WPK, 2024 WL 2880640, at *4 (S.D. Iowa May 30, 2024) (slip copy) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). In discussing *Scott*, the District Court in *City of Davenport* said: "but the nonmoving party enjoys this benefit [construing all well pled facts in favor of the non-movant] only if there is a genuine issue of fact." 2024 WL 2880640, at *4. The Court there also said in discussing *Scott*: [f]urther, in cases where, as here, there is video evidence of an incident at issue, the Court will not adopt an account of facts *plainly* contradicted by the evidence in the record." *Id*. This is correct and important here. The District Court in *City of Davenport* was imminently correct in concluding the rule announced in *Scott* was a facet of the requirement than an alleged factual dispute be a genuine one. Indeed, in *Scott*, which was an interlocutory appeal from the Eleventh Circuit on the denial of qualified immunity, explicitly reiterated summary judgment rules and discussed its new interpretation of those rules regarding whether a purported fact is blatantly contradicted by the record and found that only a genuine issue of material fact might preclude summary judgment. Bottom line, the "blatantly contradict" rule from *Scott* is at least a facet if not part and parcel of the rule that any alleged factual dispute be a genuine one.

### **1. No Excessive Force by Defendant Henderson on December 31, 2020**

A single defendant - Sgt. Richard Henderson - was involved in the use of force incident on December 31, 2020. On that date, Sgt. Henderson went to the Max Echo (EM) Pod to help other officers (non-Defendants) take Mr. Harris's temperature (as part of the jail's Covid protocol at that time), as he was reportedly refusing to cooperate. When Henderson arrived, Officer Lowrey had opened the food slot in Harris's cell door and told him that they needed to check his temperature. When Lowrey's request was ignored by Harris, Sgt. Henderson approached the door and told Harris that he

needed to be checked and Harris attacked the door and told Henderson to "go f***" himself. Because of the seriousness of the perceived Covid threat at that time, the officers needed to take Mr. Harris's temperature, so Henderson had Officer Lowrey open the cell door and Henderson drew his JPX pepper spray. When Lowrey opened the door, Harris was standing and Henderson immediately told him to sit down multiple times, but he refused. Harris then acted like he was going to throw something at Henderson, so he deployed the JPX pepper spray. After Henderson deployed the pepper spray, Harris was restrained with handcuffs and taken to the showers, where he was rinsed off and then presented to the nurse. When the officers took Harris to the nurse however,, he wouldn't cooperate with her either and she had them return Harris to his cell at that time (she was finally able to get his temperature, which was normal); Harris's cell had been completely decontaminated by the time of his return. Harris sustained no substantive injury in the incident; his eyes were a little red and his nose runny from the spray Mr. Harris's cell had a working sink. Doc. # 1, Easley Affidavit, incident records & video.

No case has ever found a constitutional violation under the abover-recited facts. To the contrary, in fact, a similar Eighth Circuit case squarely held that an officer was justified in using pepper sprary where an inmate threw things at him. *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014). There certainly appear to be no cases that clearly establish the exact opposite proposition. As such, Henderson is entitled to qualified immunity and summary judgment as a matter of law.

**2. No Excessive Force by Golden Adams, Brandon Yeley, or Mason Roberts on July 2, 2021.**

On July 2, 2021, jail officers Brandon Yeley and Mason Roberts came by Captain Golden Adams's office and told him that Harris's cell was very messy and dirty, with food containers and other items piled up, and that they needed to get in to clean it up. They asked Adams if he would help and he agreed. When the officers arrived at Harris's cell, Captain Adams told him to step out so that they could clean his cell out. He'd been cussing the officers since they first walked up (Yeley had to tell him to back away from the door in order to get the door opened) and, when the officers opened the door, Adams ordered Harris to come out of the cell and have a seat at the table (a picnic-style table in

the open area of the pod). Harris immediately failed to follow Adams's commands and Adams told him that he'd have to put Harris in handcuffs if he didn't follow instructions. Harris instead stood against the wall, stared at Adams, and refused to sit, as instructed. In light of Harris's refusal to comply with instructions, Adams approached him and proceeded to put handcuffs on him. The officers needed him to sit down so that they could get his cell cleaned out (if seated, it takes a detainee another second or two to run up on staff, so they have more time to protect themselves), but Harris refused. Adams again instructed Harris to sit down at the closest seat. When he refused, Harris took advantage of the fact that he was standing just over the seat and swept his feet, causing him to sit. After Harris was seated at the picnic table, he turned and spit on Adams. When Harris spit, Adams didn't know what communicable diseases Harris might have - this was during the height of Covid - and redirected his face away. Harris came off the seat. After Harris spit on Adams, he began actively struggling and fighting with the officers and Adams quickly realized he wasn't going to cooperate in the cleaning of his cell, so they took him back to his cell. As the officers took Harris back to his cell, he was actively fighting the officers as they were attempting to place him back in the cell. Adams held Harris down while Officer Brandon Yeley removed his handcuffs. When that was done, Adams got up and left while Harris threw things at the officers. Officer Yeley only removed the handcuffs from Harris during the altercation and Officer Roberts had no physical involvement at all (he had been trying to clean out the cell when the situation devolved). Sheriff Wayne Easley and Sgt. Richard Henderson had no personal involvement in the incident at all. Mr. Harris was not injured in the use of force described above and did not request any medical care following the incident. Doc. # 1, Easley Affidavit, incident records & video.

Like the first incident, no case has ever found constitutional liability under the facts of the second incident either. This is certainly true in Mason Roberts's case, as he had no physical involvement in the incident at all. Likewise, no case has ever even found a constitutional right - much less a violation of the same - to ***not*** have handcuffs removed, which was the only action by Defendant Yeley.

With respect to Defendant Adams, there is no case that has ever clearly prohibited his actions. First, no case has ever prohibited the act of forcing an inmate into a seat from a standing position, which would appear a de minimis use of force that wouldn't even trigger constitutional

protection in the first instance. *See, e.g., Jackson v. Buckman*, 756 F.3d 1060, 1067-68 (8th Cir. 2014) (more than de minimus use of force required). In fact, the Eighth Circuit has held the opposite in a case where a detainee was placed in a restraint chair: "The Constitution does not prohibit placing misbehaving detainees in the correctional equivalent of a timeout." *Cartia v. Beeman*, 122 F.4th 1036, 1045 (8th Cir. 2024), *cert. denied sub nom. Adams v. Gugliano*, 145 S. Ct. 2777, 222 L. Ed. 2d 1076 (2025) (citing *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("There is, of course a de minimis level of imposition with which the Constitution is not concerned.")).

There likewise appear to be no cases that have constitutionally prohibited the redirection of an inmate's face when he spits on an officer. Again, to the contrary, the Eighth Circuit specifically approved of the use of pepper spray to stop/deter a spitting detainee. *See Peterson v. Heinen*, 89 F.4th 628, 636 (8th Cir. 2023); *see also Burns, supra*. In an extremely close factual circumstance, the Eastern District of Missouri refused to impose constitutional liability on an officer whose "physical contact with plaintiff's face was to turn or lower plaintiff's head to prevent him from head butting and spitting on officers." *Arman v. Davis*, No. 4:17-CV-2360 CAS, 2019 WL 3322974, at 3 (E.D. Mo. July 24, 2019). While this is a District Court case, it certainly reflects - at the very least - that there is no clearly established law to support the exact opposite proposition.

Finally, there are certainly no cases that prohibit a jail officer from holding down a resisting detainee to allow another officer to remove his handcuffs. Again, Eighth Circuit precedent stands for the opposite proposition, expressly approving of normal physical force to subdue a ressiting detainee. *See, e.g., Peterson, supra.*

For these reasons, Defendants Adams, Yeley, and Roberts are entitled to qualified immunity and summary judgment as a matter of law.

**<u>3. No Personal Involvement or Training Liability for Sheriff Wayne Easley</u>**

Miller County Sheriff Wayne Easley has been sued individually, but had no personal involvement in any of the incidents referenced in the Complaint. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal

liability of the supervisory defendants, [the plaintiffs] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [their] constitutional rights." *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted). A county official or employee may be held liable in his or her individual capacity only in a few well-delineated fact situations. Essentially there must be some personal involvement before any defendant may be held liable under § 1983. *See, e.g., Messimer v. Lockhart*, 702 F.2d 729 (8th Cir. 1983).

To the extent that the Plaintiff attempts to make a training or supervision claim(s) against Sheriff Easley (he certainly fails to plead any facts in support of such a claim(s)), such claim(s) likewise fail as a matter of law. When a defendant is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity and summary judgment unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts. *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir.2012). As against an entity such as Miller County for failure to train, the County can only be liable where "(1) the county's training practices were inadequate; (2) the county was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by the county; and (3) an alleged deficiency in the training procedures actually caused the plaintiff's injuries." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (internal citations omitted).

Here, the Plaintiff has not presented, and cannot present, any evidence of deliberate indifference to any known training or supervision need prior to the events in this case. To the contrary, jail staff at the Miller County Jail are trained under a comprehensive training system that meets or exceeds the requirements of state law. This training includes jail standards training, medical and emergency response training, training in the policies of the jail, and training on recognizing and reporting medical problems to the jail's medical staff and/or emergency medical responders. Ex. 1, Easley Affidavit. Additionally, the Sheriff's department employs a chain of command, in addition to other mechanisms like camera systems, post-incident investigations, and other mechanisms, that provides for the comprehensive supervision of jail employees. *Id.* No case

has ever imposed constitutional liability under a training or supervision theory in the face of such protocols, particularly where, as here, the Plaintiff can present no proof to show that training and/or supervision failures had created a known risk to the detainees' health or safety prior to the events in this case and that such risk had been ignored by the Defendant. *See Sturgeon v. Faughn,* 36 F.4th 804, 809-10 (8th Cir. 2022)*; Andrews v. Fowler*, 98 F.3d 1069 (8th Cir. 1996); *Henry v. Franks*, No. 3:22-cv-00186-PSH, 2024 WL 1311307, at 10 (E.D. March 27, 2024) (slip copy). As such, any training and/or supervision claims, no matter how couched, fail as a matter of law.

Sheriff Easley is entitled to qualified immunity and summary judgment as a matter of law.

**B. No Official Capacity/County Liability**

The Plaintiff has sued the Separate Miller County Defendants in both their individual and official capacities. Doc. # 23. It is well-settled that a suit against a county official or employee, in his official capacity, is the equivalent of a suit against the county itself. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991). Official capacity suits represent "only another way of pleading an action against an entity of which an officer is an agent." *See Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978). In short, "an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. At 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985). In fact, when officials of a county die or leave office, their successors *automatically* assume their roles in the litigation. *See Hafer*, 502 U.S. at 25 (citing Fed. R. Civ. Proc. 25(d)(1); Fed. Rule App. Proc. 43(c)(1); and S. Ct. Rule 35.3). Furthermore, multiple official capacity claims against officials and employees of the same entity are legally identical and redundant, such that the dismissal of one precludes further litigation of any of the others. *See Baker v. Chisom*, 501 F.3d 920 (8th Cir. 2007), *cert denied*, 554 U.S. 902.

There is no vicarious liability for Miller County under federal or state constitutional law. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also* Ark. Code Ann. 21-9-301(b) (No action against an Arkansas county "because of the actions of its agents or employees"). Accordingly, a governmental entity, here Miller County, may

be held liable for the unconstitutional acts of its officials and/or employees only when those acts implement or execute an unconstitutional county policy or custom. *See Doe v. Washington County*, 150 F.3d 920, 922 (8th Cir. 1998). The county would be liable for an employee's conduct only if the subject officer were (1) a County employee or official and (2) if the officer was implementing or executing an unconstitutional county policy or custom that (3) directly caused plaintiff's injury. *See Board of County Comm'rs v. Brown*, 520 U.S. 397(1997). In the absence of a written policy, plaintiff must identify a pattern of widespread unconstitutional conduct that was so pervasive and well-settled that it had the effect of law. *See Jane Doe A v. Special Sch. Dist. of St. Louis County*, 901 F.2d 642, 646 (8th Cir. 1990). Plaintiff must show that the County "through its deliberate conduct . . . was 'the moving force' behind the injury alleged." *Brown*, 520 U.S. at 526.

In his constitutional claim(s) in this case, Plaintiff has no proof of any unconstitutional county policy or custom, no proof of any underlying violation of his rights (*see supra*),and certainly no proof to show that an unconstitutional county policy or custom was "the moving force" behind an underlying violation of his rights. To the contrary, the proof establishes that Miller County had constitutionally appropriate policies in place to govern the use of force by Deputies. *See* Ex. 1, Easley Affidavit & attached policies. Accordingly, the Defendants are entitled to summary judgment as a matter of law with respect to Plaintiff's official capacity/county claim under the constitution.

Finally, the County - and any individual Defendants sued under this heading[2] - is likewise entitled to summary judgment on the Plaintiff's ADA claim. The Plaintiff's ADA claim asserts - with little or no factual pleading - that his rights under the ADA were violated in generalized ways by the jail's purported, and highly generalized, failure(s) to comply with the ADA. Doc. # 3. This is insufficient, as recognized by the Eighth Circuit in *Mason v. Corr. Med. Servs., Inc.*, where a similar claim was rejected:

---

[2] The Complaint does not appear to plead any claim(s) against individual Defendants for an ADA violation(s) and certainly makes no discrete factual allegations in that regard against any individual Defendant; rather, the claim seems directed toward the County itself. Doc. # 3. The Defendants expressly seek qualified immunity, as applicable, and summary judgment on any ADA claim(s) made by the Plaintiff and will address any purported ADA claim(s) gainst individual Defendants in more depth, if necessary, on reply.

> [Plaintiff] cites no authority for the proposition that he is entitled to a general "disability assessment..." MDOC's current policy is to respond to ADA requests on an "as-needed basis." To show a violation of Title II, Mason must specify a benefit to which he was denied meaningful access based on his disability. 42 U.S.C. § 12132. [Plaintiff] has failed to identify a particular benefit that MDOC denied him, and the allegation that the requested assessment might uncover unspecified violations of the ADA is not enough to create a disputed issue for trial with respect to this accommodation."

559 F.3d 880, 888 (8th Cir. 2009).

In the end, the Plaintiff alleged no facts in support of its ADA claim and has no proof to support such a claim.

For these reasons, Miller County - including all Defendants in their official capacities, is entitled to summary judgment as a matter of law.

## III. CONCLUSION

For the reasons set forth herein, the Separate County Defendants are entitled to qualified immunity and summary judgment as a matter of law..

Respectfully submitted,

Sheriff Wayne Easley, Golden Adams, Richard Henderson, Brandon Yeley and Mason Roberts, individually and in their official capacities, *Defendants*

Jason E. Owens
Ark. Bar. No. 2003003
OWENS & PARKER LAW FIRM, P.A.
**Mailing Address:** P.O. Box 850
Conway, Arkansas 72033-0850
**Physical Address:** 1160 Markham St., Ste. 2
Conway, Arkansas 72032
Telephone (501) 764-4334
Telefax (501) 764-9173
email: owens@jowenslawfirm.com